UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

United States of America

v.

Horace Garfield Tajah and
Latanya Nekesha Notice,

                        Defendants.

Decision and Order
and
Report and Recommendation

13-CR-55V

## I.     INTRODUCTION

This case has been referred to this Court under 28 U.S.C. § 636(b).  (Dkt. No. 11.)

Pending before the Court are omnibus pretrial motions filed by defendant Latanya Notice

("Notice") on August 2, 2013 (Dkt. No. 23).[1]  Broadly, Notice seeks various types of pretrial

discovery and suppression of statements that she allegedly made while in secondary inspection with

border inspection and enforcement agents.  The Court held oral argument on September 3, 2014

and June 29, 2016, and held suppression hearings on February 10, April 7, and May 7, 2015.

The Court now issues its non-dispositive rulings as explained below.  With respect to

Notice's dispositive motion to suppress, the Court recommends denying the motion.

---

[1] Co-defendant Horace Tajah ("Tajah") had requested joinder in Notice's motions.  (Dkt. No. 24.)
The Court had granted the request.  (Dkt. No. 25.)  On September 24, 2015, Tajah informed the Court
that he was withdrawing any pretrial motions without prejudice, presumably to pursue a pretrial resolution.
(Dkt. No. 92.)  For the sake of the record, the Court notes that Tajah participated fully in the suppression
hearings for this case and that the facts of the case are identical as to both defendants.  If no pretrial
resolution occurs for Tajah then he can seek leave to have all of the findings and recommendations in this
writing apply to him equally.

II.     BACKGROUND

This case concerns allegations that Tajah and Notice, both Jamaican nationals, tried to enter the United States by lying to border inspection and enforcement agents and by presenting someone else's U.S. passport as their own.

A.      *Primary Inspection*

On January 23, 2013, U.S. Customs & Border Protection ("CBP") agent Dennis Major ("Major") was on duty at the Peace Bridge port of entry in Buffalo, New York.  A bus from Canada arrived at the Peace Bridge bus terminal around 2:30 AM; Tajah and Notice were among the passengers.  Per normal practice, the bus passengers "would have disembarked the bus, collected their luggage, entered the bus terminal, which is adjacent to the head house, and processed in order."  (Dkt. No. 88 at 10.)  When Tajah and Notice's turn came for processing, Major called them as a couple because they appeared to be traveling together; "[t]hey were standing together, they had common luggage and they were talking to each other."  (*Id.* at 11.)  Tajah and Notice had between five and seven pieces of luggage with them.  (*Id.*)  Notice came forward first and presented a Jamaican passport, an I-551 "green card," and a New York State identification card.  (*Id.* at 12.)  After asking Notice questions pertaining to "citizenship, place of birth, length out of the country, reason for travel, [and] destination," Major was satisfied that Notice was who she claimed to be. (*Id.* at 14.)

Major's examination of Tajah went differently.  Upon the same questioning from Major, Tajah gave the name of Kermar Notice—Notice's brother—and presented a U.S. passport with that name in it.  Major compared the photograph of the passport with the person standing in front of

2

him and did not believe that they matched, but Tajah had no second form of identification.  (*Id.* at

17.)  Major took a closer look after Tajah removed his hat, but remained unsatisfied as to who

Tajah really was.  Through some additional questions, Notice explained that she and Tajah were

siblings who just spent three days in Canada.  (*Id.* at 19.)  Notice's answer about the duration of

the trip prompted Major to ask why she and Tajah had so much luggage for just a three-day trip.

Notice responded that she and Tajah were in Jamaica before spending time in Canada.  (*Id.*)  Tajah

added that he was from Bronx, New York and confirmed that he and Notice were siblings.  Tajah

aroused Major's suspicions further when he went through the motions of searching his pockets for

a second form of identification.  "Under inspections you would assume somebody would know

that they have identification in their pocket or not and wouldn't have to search for something they

didn't have."  (*Id.* at 34.)

> B.    *Secondary Inspection*

The events of the evening passed from a routine primary inspection to more of a secondary

inspection; questioning at the bus terminal itself is considered primary inspection.  (*Id.* at 73.)

Major called in another officer for assistance and brought Tajah to a digital fingerprinting machine

in an adjacent building for further inspection.  (*Id.* at 21–22.)  The second officer, Lakeisha

Thomas ("Thomas"), also examined Tajah and the passport that he presented and concluded that

they did not match.  (*Id.* at 74.)  Through this time, Tajah and Notice were not free to leave the

inspection area but were not handcuffed or otherwise restrained.  (*Id.* at 22.)  Tajah cooperated

with the fingerprint inspection, and Major was not armed at the time.  (*Id.* at 24.)  The fingerprint

inspection took about five minutes and returned a result of a different identity than the one that

Tajah gave. (*Id.* at 25.) Specifically, the fingerprint check came back positive with results that included Tajah's actual name. Major placed Tajah in a holding cell pending further investigation. Major's concerns about Tajah were straightforward: "We had no travel documents that were legitimately his. There were multiple names on the results. And we weren't conclusive." (*Id.* at 28.) The entire inspection and fingerprint process for Tajah and Notice took about 35 minutes up to this point. (*Id.* at 26.)

        C.    *Charges and Proceedings Here*

        Once the fingerprint inspection confirmed the discrepancy between who Tajah was and who he claimed to be, Major and Thomas realized that they had a possible criminal offense before them—identity theft or illegal use of someone else's passport. (*See id.* at 42, 89–90.) The agents also realized that Notice might have lied to them when she claimed that Tajah was her sibling. (*See id.* at 52, 89.) Notice wound up detained as well—though apparently never restrained or placed in a holding cell—"because they were traveling together . . . . We didn't know his identity. We don't know the relationship between the two people . . . . There's a possibility fraud exists." (*Id.* at 60.) Neither Tajah nor Notice received *Miranda* warnings during the primary and secondary inspections. (*Id.* at 65, 107.)

        At this point, CBP enforcement agent Mark Jann ("Jann") was called into the case. Compared to the CBP inspection agents, the enforcement agents conduct criminal investigations that spawn from any border situations. (Dkt. No. 86 at 6, 8.) Jann ran a criminal background check on Tajah based on his fingerprints and found a match in an FBI database under the name Keith Borell. (*Id.* at 18.) Jann asked Notice into his office to talk to her. With Thomas observing,

Jann administered *Miranda* warnings and interviewed Notice. (*Id.* at 21, 23–25.) Notice waived

her *Miranda* rights and indicated that she wanted to give a statement. (*Id.* at 29–30.) Notice then

stated that the name of her travel companion was Horace Tajah. (*Id.* at 36–38.) Notice conceded

that Tajah was her husband, not her brother. (*Id.* at 86.) Notice also explained that Kermar

Notice was in fact her brother, but that her brother was not traveling with her. (*Id.* at 87.) Jann

reduced the interview to writing. (Dkt. No. 65-1.) The written interview report contains written

*Miranda* warnings with checkmarks after each right stated and Notice's signature underneath. (*Id.*

at 2.) Notice gave a second signature under the written waiver. (*Id.*) Notice also initialed each

page of the transcribed questions and answers and signed one more time at the end.

Jann next interviewed Tajah; he wanted to interview Tajah without restraints, but his

supervisor said no. (Dkt. No. 86 at 38.) Jann began by asking Tajah's name, date of birth, and

citizenship. Tajah answered that his name was Kermar Notice, that his date of birth was one from

1985, and that he was a U.S. citizen. (*Id.* at 38–39.) Jann did not provide *Miranda* warnings yet

because, in his view, the questions pertained only to the border function of confirming identity,

and Tajah's identity had not yet been established definitively. (*Id.* at 39–40.) Jann's next question

was, "Do you understand that we did fingerprint you?" (*Id.* at 41.) Tajah allegedly reacted by

putting his head down in his handcuffs and saying, "All right, I will tell you the truth." (*Id.*) Jann

then administered *Miranda* warnings. (*Id.*; *id.* at 42–43.) Jann gave Tajah *Miranda* warnings when

he did "[b]ecause at the time prior to that he still didn't—I didn't know what his identity was, so as

an immigration officer I have to determine that. But when he told me that he would tell me the

truth, I believed that he was going to incriminate himself and then wanted him to know his rights

5

prior to that.") (*Id.* at 45–46; *see also id.* at 97–98.) Jann proceeded with the rest of the interview,

which he reduced to a written report. (*See* Dkt. No. 58.) As with Notice's first report, Tajah's

written interview report contains written *Miranda* warnings with checkmarks after each right stated

and Tajah's signature underneath. (*Id.* at 2.) Tajah gave a second signature under the written

waiver. (*Id.*) Tajah also initialed each page of the transcribed questions and answers and signed

one more time at the end. After the interview, Tajah returned to a holding cell. (Dkt. No. 86 at

107.)

The criminal investigation continued in the hands of CBP enforcement agent Jill Kulczyk

("Kulczyk"), who was called to the Peace Bridge after the first criminal interviews of Tajah and

Notice. Kulczyk intended to question Notice further; a second round of questioning is considered

normal practice. (Dkt. No. 87 at 9.) Kulczyk found Notice in a general waiting area with the rest

of the public and brought Notice to her office. Kulczyk considered Notice free to leave the office

at any time, "but once you leave our office it is a secure secondary area so you would need a key

card to actually leave the building." (*Id.*; *see also id.* at 15 ("If she was unwilling to make the

statement regarding the criminal case, at that point she would have been handled administratively

regardless.").) Kulczyk gave Notice *Miranda* warnings again before proceeding with any questions.

(*Id.* at 10.) Kulczyk then proceeded with a second interview that turned into a second report that

Notice signed. (*Id.* at 12.) Notice initialed each page of the second report, made a few edits on one

page, and signed the last page. (*See generally* Dkt. No. 65-2.)

The events of January 23, 2013 led to criminal charges for both Tajah and Notice. On

January 25, 2013, this Court signed pre-indictment criminal complaints for Tajah and Notice.

(Dkt. Nos. 1, 1(1).)  Following a detention hearing on January 31, 2013, the Court ordered Tajah

detained but released Notice on conditions including a signature bond.  (Dkt. Nos. 3, 3(1).)  On

March 1, 2013, the Government filed an indictment against Tajah and Notice.  (Dkt. No. 10.)

The indictment contains seven counts.  In short, the Government accuses Tajah of illegal reentry

of an alien removed for an aggravated felony; misuse of another person's passport; a false claim of

U.S. citizenship; false statements to federal law enforcement agents; and aggravated identity theft.

The Government accuses Notice of misuse of another person's passport; encouraging and inducing

illegal reentry; false statements to federal law enforcement agents; and aggravated identity theft.

The Court arraigned both defendants on March 19, 2013.  (Dkt. No. 13.)

The Court will address each of Notice's pretrial motions separately below.

## III.   DISCUSSION

### A.   *Motion for Rule 16 Discovery (Non-dispositive)*

Notice seeks Federal Rules of Criminal Procedure ("FRCP") Rule 16 discovery including

statements, scientific tests, seized evidence, reports, expert information, and wiretap information.

The Government responds that it has provided all information falling under Rule 16 and has

provided the appropriate objections for information that should not be disclosed at all or until

trial.  The Government's response should be sufficient unless new issues arise prior to trial.

### B.   *Motion for* **Brady** */Jencks/* **Giglio** *Information (Non-dispositive)*

Notice seeks information subject to disclosure under *Brady v. Maryland*, 373 U.S. 83 (1963),

the Jencks Act, 18 U.S.C. § 3500, and *Giglio v. U.S.*, 405 U.S. 150 (1972).  "[S]uppression by the

prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

the prosecution . . . . Society wins not only when the guilty are convicted but when criminal trials

are fair; our system of the administration of justice suffers when any accused is treated unfairly."

*Brady*, 373 U.S. at 87.  The *Brady* rule covers situations "[w]hen the reliability of a given witness

may well be determinative of guilt or innocence."  *Giglio*, 405 U.S. at 154 (internal quotation

marks and citation omitted); *accord U.S. v. Bagley*, 473 U.S. 667, 676 (1985) (plurality opinion)

("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule.")

(citing *Giglio*).  When considering information that might fall under the *Brady* rule, "[t]he question

is not whether the defendant would more likely than not have received a different verdict with the

evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a

verdict worthy of confidence."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  The Government does

not necessarily have to await a defense request to produce information that falls under the *Brady*

rule, but neither does it need to adopt an "open file policy."  *See id.* at 437; *see also U.S. v. Payne*, 63

F.3d 1200, 1208 (2d Cir. 1995) ("Under *Brady* and its progeny, the government has an affirmative

duty to disclose favorable evidence known to it, even if no specific disclosure request is made by

the defense.  The individual prosecutor is presumed to have knowledge of all information gathered

in connection with the government's investigation.") (citations omitted).  Also, "[e]vidence is not

'suppressed' if the defendant either knew, or should have known, of the essential facts permitting

him to take advantage of any exculpatory evidence."  *U.S. v. LeRoy*, 687 F.2d 610, 618 (2d Cir.

1982) (citations omitted).  As for the timing of *Brady* disclosure, "[i]t is not feasible or desirable to

specify the extent or timing of disclosure *Brady* and its progeny require, except in terms of the

sufficiency, under the circumstances, of the defense's opportunity to use the evidence when

disclosure is made.  Thus disclosure prior to trial is not mandated.  Indeed, *Brady* requires

disclosure of information that the prosecution acquires during the trial itself, or even afterward

. . . . At the same time, however, the longer the prosecution withholds information, or (more

particularly) the closer to trial the disclosure is made, the less opportunity there is for use." *Leka v.*

*Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) (citations omitted).

 Here, the Government has acknowledged its affirmative obligations for disclosure under

*Brady*, the Jencks Act, and *Giglio*, and has committed to making disclosures within the time that

the District Judge will set in the eventual trial order.  The Government's commitment will suffice,

absent a showing that a different arrangement is necessary in this case.

 C.  *Motion for FRE 403, 404(b), 608, 609, and 807 Material (Non-dispositive)*

 Notice seeks apprisal of evidence that the Government would use at trial under Federal

Rules of Evidence ("FRE") 403, 404(b), 608, 609, and 807.  FRE 403 has no specific provision for

pretrial disclosure; any issues under that rule are best left to the District Judge.  FRE 404(b)

governs requests for disclosure of all evidence of prior bad acts that the Government intends to use

in its case-in-chief.  FRE 404 requires that defendants be given "reasonable notice in advance of

trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature

of any such evidence it intends to use at trial."  To the extent that the Government intends to use

any such evidence of a prior bad act in its case in chief, the Government shall produce all FRE

404(b) evidence as directed by the District Judge in the trial order.

9

With respect to Notice's requests under FRE 608 and 609, the only requirement imposed by either Rule applies closer to trial. FRE 609(b)(2) mandates that "the proponent [give] an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use." To the extent that the Government intends to use at trial evidence falling under these rules, it must give reasonable notice as directed by the District Judge in the trial order.

FRE 807(b) states that proposed evidence under that rule "is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it." The Government currently does not anticipate introducing evidence that would fall under FRE 807 but has agreed to provide reasonable notice if circumstances change. (*See* Dkt. No. 26 at 14.)

D.  *Motion for Preservation of Agent Notes, Dispatch Tapes, and Related Materials (Non-dispositive)*

Notice seeks an order requiring law enforcement agents who participated in this case to preserve their rough notes and related information. The Government has not objected to preservation that does not carry over to unwarranted disclosure. (*See* Dkt. No. 26 at 8.) The Court directs the Government to arrange for preservation of rough notes and related information pending further instructions from the District Judge at trial.

E.  *Motion for Discovery of Wiretap Information (Non-dispositive)*

Notice seeks an order requiring production of "copies of all audio tapes, body tapes, wire taps, recording, video tapes, and any other electronic surveillance that pertains to this case." (Dkt.

No. 23 at 6.)  "The government is unaware of any Audio or video taped evidence, wire taps or

search warrants in this case." (Dkt. No. 26 at 8.)  Barring unforeseen events that the District Judge

can address, the Government's response will suffice.

F.      *Motion for Discovery of Government Witnesses including confidential informants (Non-dispositive)*

Notice seeks the identities of Government witnesses and of confidential sources mentioned

in prior law enforcement affidavits.  Notice also wants identifying information about any other

confidential sources, including any promises of leniency and any prior cooperation with law

enforcement.  "What is usually referred to as the informer's privilege is in reality the Government's

privilege to withhold from disclosure the identity of persons who furnish information of violations

of law to officers charged with enforcement of that law.  The purpose of the privilege is the

furtherance and protection of the public interest in effective law enforcement.  The privilege

recognizes the obligation of citizens to communicate their knowledge of the commission of crimes

to law-enforcement officials and, by preserving their anonymity, encourages them to perform that

obligation.  The scope of the privilege is limited by its underlying purpose.  Thus, where the

disclosure of the contents of a communication will not tend to reveal the identity of an informer,

the contents are not privileged.  Likewise, once the identity of the informer has been disclosed to

those who would have cause to resent the communication, the privilege is no longer applicable.  A

further limitation on the applicability of the privilege arises from the fundamental requirements of

fairness.  Where the disclosure of an informer's identity, or of the contents of his communication,

is relevant and helpful to the defense of an accused, or is essential to a fair determination of a

cause, the privilege must give way.  In these situations the trial court may require disclosure and, if

11

the Government withholds the information, dismiss the action." *Roviaro v. U.S.*, 353 U.S. 53, 59-61 (1957) (citations omitted). "The defendant bears the burden of showing the need for disclosure of an informant's identity, and to do so must establish that, absent such disclosure, he will be deprived of his right to a fair trial. If such is established, the government's privilege must give way." *U.S. v. Fields*, 113 F.3d 313, 324 (2d Cir. 1997) (citations omitted).

Here, Notice has not demonstrated what informant disclosure would accomplish at the pretrial stage that other pretrial discovery has not accomplished already. *Cf. id.* ("The need for disclosure is far less compelling when, as here, it is sought in connection with a pretrial suppression hearing on issues [probable cause and inconsistencies] which do not bear on defendant's guilt."). The Government additionally has responded that it "is not aware of the involvement of any informants in this investigation." (Dkt. No. 26 at 9.) Barring unforeseen events that the District Judge can address, the Government's response will suffice.

G.      *Motion for Grand Jury Minutes and Transcripts (Non-dispositive)*

Notice included in her motion for discovery a request for the minutes of the grand jury proceedings. Notice wants the minutes "to determine whether there has been compliance with Rule 6 with regard to attendance and the number of Grand Jurors voting on this indictment." (Dkt. No. 23 at 9.) "Parties seeking disclosure have the burden of showing that the requested material is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *In re Grand Jury Subpoena*, 72 F.3d 271, 274 (2d Cir. 1995)

(citation omitted).  Here, Notice's request for disclosure is too speculative.  *See U.S. v. Smith*, 105 F. Supp. 3d 255, 261–62 (W.D.N.Y. 2015).  The Court denies the motion accordingly.

      H.      *Motion for* **Henthorn** *Discovery (Non-dispositive)*

      Notice seeks disclosure of information that was made available under *U.S. v. Henthorn*, 931 F.2d 29 (9th Cir. 1991).  The requested information includes bias or prior acts of Government witnesses; information affecting a witness's ability to testify; and impeachment information in any law enforcement agent's personnel file.  Unless Notice is requesting preemptive, unlimited discovery of personnel files—which would be denied—she has not explained how this request differs from the Government's standing obligation to provide *Brady* / Jencks / *Giglio* information, wherever it may be found.  *See U.S. v. Quinn*, 123 F.3d 1415, 1422 (11th Cir. 1997); *U.S. v. Robinson*, No. 09-CR-203S(SR), 2010 WL 2595314, at *12 (W.D.N.Y. June 24, 2010) ("The Court reminds counsel for the government that *Brady*, *Giglio* and their progeny dictate that the government's obligation to disclose material favorable to the accused extends to information that impeaches the credibility of the government's witnesses regardless of the witnesses' employer."); *U.S. v. Cain*, No. 05-CR-360A(SR), 2007 WL 1385726, at *2 (W.D.N.Y. May 9, 2007) ("This mandate [in *Henthorn*] is, in essence, that which is required under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, including *Giglio v. United States*, 405 U.S. 150 (1972).").  The Court thus denies the motion as moot.

      I.      *Motion for Suppression of Statements from January 23, 2013 (Dispositive)*

      Notice has made a motion to suppress any statements that she gave to Major, Jann, or Kulczyk during the events of January 23, 2013.  Notice argues that she was in criminal custody for

*Miranda* purposes by the time she made any statements about herself, Tajah, or their situation.

Specifically, Notice argues that she "was detained at an international border by Federal agents, and

was questioned and placed in a room by several government officials, where she was interrogated

for several hours.  At no time during the hearing did any of the agents state that Miss Notice was

told during the interrogation that she was free to leave at anytime.  She was obviously *not* there

voluntarily.  Once inside the office, Miss Notice was asked about her involvement in the crimes

committed by defendant Tajah.  She denied involvement, and was then confronted with accusatory

statements by agents Jann and Kulczyk.  No reasonable person given the totality of the situation

would have felt that they were free to leave." (Dkt. No. 119 at 7.)  Notice's motion also contains

an argument that any *Miranda* warnings administered were inadequate to protect her from the

coercive environment that she faced.  (*See id.* at 11 ("Both agents Jann and Kulczyk admitted on

cross-examination that Miss Notice **denied** any involvement.  It was only **after** agent Jann asked

defendant many accusatory questions that Miss Notice made inculpatory statements.  This is after

being placed under arrest, detained for several hours, jailed, physically placed in multiple closed

rooms with multiple government agents, and being threatened not to lie.").)  The Government

responds by dividing the events of January 23, 2013 into what could be called border questioning

and criminal questioning.  The Government argues that the initial events of primary and

secondary inspection constituted border questioning; "Officer Major and Officer Thomas were

conducting inspections to determine whether Horace Tajah and LaTanya Notice were admissible

into the United States.  All their pre-*Miranda* questions were focused on verification of their

identities, citizenship and admissibility." (Dkt. No. 89 at 8.)  The Government implicitly concedes

that post-secondary events amounted to a custodial interrogation at some point, but that the agents administered *Miranda* warnings before Tajah and Notice said anything in response to criminal questioning as opposed to border questioning.  (*See id.* at 9–10; Dkt. No. 121 at 3.)

The basic *Miranda* principles are well known.  "Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.  If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."  *Miranda v. Arizona*, 384 U.S. 436, 474 (1966).  "Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.  The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned."  *Id.* at 445.  The invocation of the right to remain silent must be unambiguous; if it is then the defendant cuts off all questioning about that offense.  *See Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (citation omitted).

"Statements elicited in noncompliance with [*Miranda*] may not be admitted for certain purposes in a criminal trial.  An officer's obligation to administer *Miranda* warnings attaches, however, only where there has been such a restriction on a person's freedom as to render him in custody.  In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal quotation and editorial marks and

citations omitted); *see also Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012) ("As used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."). "[A] police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of Miranda." *Id.* at 324 (citation omitted). Nonetheless, "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Id.* at 325 (internal quotation marks and citations omitted). Additionally, "custody" for *Miranda* purposes is more narrow in scope than a Fourth Amendment "seizure" with its temporary denial of the freedom to leave. *Cf, e.g., Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) ("The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*."). In the context of international travel to the United States, "(a) in which compulsory questioning—with no freedom to enter the United States and with nowhere else to go—inheres in the situation and (b) in which the traveler has voluntarily submitted to some degree of confinement and restraint by approaching the border, a reasonable traveler will expect some constraints as well as questions and follow-up about his or her citizenship, authorization to enter the country, destination, baggage, and so on. That one expects both constraints and questions-and that, at least initially, every traveler in the [port of entrry] must submit to the same sort of questioning while not free to leave–reduces the likelihood that reasonable persons in that situation

16

would consider themselves to be under arrest." *U.S. v. FNU LNU*, 653 F.3d 144, 153–154 (2d Cir. 2011).

In addition to the requirement of custody, the need for *Miranda* warnings also requires that interaction between a person and law enforcement officials qualify as an "interrogation." "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). A conversation that included no questions about the crime under investigation or the defendant's conduct would not count as custodial interrogation. *See Arizona v. Mauro*, 481 U.S. 520, 527 (1987). Also, "[t]he mere fact of police presence in a police office is not the 'functional equivalent' of express questioning." *Isasi v. Herbert*, 176 F. App'x 143, 144 (2d Cir. 2006) (summary order) (citation omitted).

Here, the CBP agents who interacted with Tajah and Notice drew the line between border questioning and criminal questioning in the right place. The events of January 23, 2013 began with a bus full of passengers that just crossed an international border. A reasonable passenger on that bus would have expected some level of questioning and processing that would have included a

confirmation of identity.  That same reasonable passenger would not have expected to be able to leave the bus terminal and to go on her way while questions remained about her identity or the identity of a purported family member traveling with her.  *Cf. U.S. v. Djibo*, ___ F. Supp. 3d ___, No. 15 CR 88 (SJ)(RER), 2015 WL 9274916, at *7 (E.D.N.Y. Dec. 16, 2015) ("In terms of voluntariness, while Djibo did not ask to be selected, he did intend to travel internationally and . . . that choice makes the interaction voluntary enough for the purposes of this analysis.").  The primary and secondary inspection consisted of questions that would have confirmed Notice's identity and recent travel history along with her continued travel plans with Tajah.  *Cf. U.S. v. Yilmaz*, 508 Fed. App'x 49, 52 (2d Cir. 2013) (summary order) (finding no *Miranda*-type custody during a secondary inspection where the defendant "was also asked about the purpose of his trip, how he had entered Canada, his plans for the vehicle once he entered the United States, and the reason for his possession of several thousand dollars in United States currency . . . . While the secondary inspection was undoubtedly more thorough than the primary inspection, the objective function of the officers' inquiries concerned admissibility, and a reasonable person in Yilmaz's position would not have considered what occurred to be the equivalent of a formal arrest.  Rather, a reasonable person would consider the secondary inspection par for the course of entering the country from abroad.") (internal quotation marks and citations omitted).  Consequently, all of the questions that Tajah and Notice faced about who they were, their citizenship, their relation to each other, their destination, and who Tajah really was fell within the scope of reasonably expected processing.

The results of Tajah's fingerprint check, and Jann's presentation of the results to Tajah, marked a sharp change from border processing to criminal interrogation.  At that point, even if the agents did not know exactly who Tajah was, they knew that a potential criminal situation was in front of them.  *Cf. U.S. v. Miller*, 441 Fed. App'x 804, 806 (2d Cir. 2011) (summary order) (finding the custodial nature of border questioning "a much closer question" once the agent became confident that the defendant was not who he said he was).  Also, Tajah knew very well that he had just been fingerprinted; Jann's question, "Do you understand that we did fingerprint you?" served no purpose except to signal to Tajah that the jig was up.[2]  The agents administered *Miranda* warnings, however, before Notice made any alleged statements after this point about Tajah or the passport that he was carrying.  The agents administered the warnings to Notice twice, and in writing, giving her opportunities to ask any questions if she did not understand her rights.

The final question thus becomes whether Notice made a knowing and voluntary waiver of her Fifth Amendment rights.  "To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right."  *U.S. v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citations omitted).  Courts assess the totality of the circumstances when determining the validity of a waiver.  *See Fare v. Michael C.*, 442 U.S. 707, 725 (1979)

---

[2] Tajah allegedly made one statement between the asking of the question and the administration of *Miranda* warnings to him: "All right, I will tell you the truth."  Whether this statement would need to be suppressed would present a close question had Tajah not withdrawn his pretrial motions.  As it stands, the issue is not formally before the Court.

(citations omitted). "Circumstances that support a finding of involuntariness may include the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as deprivation of food or sleep." *U.S. v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (internal quotation marks and citations omitted). Here, Notice indicated in writing that she understood her rights and that she wanted to proceed. *Cf. Toste v. Lopes*, 861 F.2d 782, 783 (2d Cir. 1988) ("After the warning, he orally indicated that he understood and signed a written form acknowledging that he comprehended his rights. At a second questioning session, Toste was again warned of his rights in the same explicit fashion. He again indicated that he understood and signed a statement acknowledging this.") (citation omitted). The agents never drew weapons and never employed deceptive or overtly coercive tactics. *Cf. U.S. v. Anderson*, 929 F.2d 96, 100 (2d Cir. 1991) (affirming a *Miranda* violation and a suppression of statements where the "agent's statements ruled out that possibility [of future cooperation], and may have created in Anderson's mind a false sense that he must confess at that moment or forfeit forever any future benefit that he might derive from cooperating with the police agents"). While Notice was a Jamaican national, she expressed no difficulty in understanding English. *Cf. Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989) (finding a valid *Miranda* waiver from a defendant where, "although he spoke in broken English with an accent and occasionally lapsed into Spanish, his command of English was sufficient for him to have understood the *Miranda* warnings given to him"). Finally, while Notice could not leave the inspection facilities completely, she was never under restraints and was allowed to spend time in a

waiting room also used by the general public.  Under the circumstances, then, each of Notice's *Miranda* waivers were knowing and voluntary.

In sum, Notice went through reasonable border questioning that did not require *Miranda* warnings, and then she received *Miranda* warnings once the situation with her and Tajah turned into a custodial interrogation.  Notice has not demonstrated any reason to suppress the statements that she gave to the agents.  The Court thus recommends denying Notice's motion.

## IV.   CONCLUSION

For the foregoing reasons, the Court recommends denying Notice's dispositive motion to suppress.  (Dkt. No. 23.)  The Court also adjudicates each of Notice's non-dispositive motions as explained above.

## V.   OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); FRCP 59.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

_/s Hugh B. Scott_

Honorable Hugh B. Scott
United States Magistrate Judge

DATED: July 11, 2016